IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. CR 07-30012-01-PA |
| v. ) | |
| ) | OPINION AND ORDER |
| MARTIN JOSEPH ANGELEAS, JR., ) | |
| ) | |
| Defendant. ) | |
| _____) | |

PANNER, District Judge:

Prior to trial, I granted the motion by Defendant Angeleas to dismiss counts two through four of the superseding indictment. This opinion explains my reasons for granting that motion.

### **Background**

Angeleas worked as a bouncer at a nightclub which was losing business to a rival nightclub. Angeleas decided to set fire to the rival nightclub, and enlisted several friends to help with the plot. After everyone left for the night, they intended to hurl onto the roof two vodka bottles containing a flammable liquid to be ignited by burning wicks.

Two of the conspirators were observed lurking in the alley. The police were called, and the plot quickly unraveled. The police soon had footage from video surveillance cameras, incriminating text messages, along with the fuel cans, vodka

1 - OPINION AND ORDER

bottles, and wicks.  The conspirators never got an opportunity to ignite their homemade devices.  If the devices had been lighted, the plotters would have been in for a surprise.

The fuel cans, which they had stolen from the back of a truck, did not contain gasoline, or even diesel fuel, each of which is engineered to burn.  Rather, the fuel cans contained a special blend of hydraulic oil used in logging machinery.  The parties' experts agree this particular fluid would have to be heated to a temperature exceeding 400 degrees Fahrenheit before it would emit a concentration of fumes sufficient to ignite upon exposure to an ignition source.

The wicks, if they had been lit, were incapable of igniting the bottles of hydraulic oil or the puddle of hydraulic oil that would form if the bottles were hurled onto the roof and shattered.  The cloth wick would absorb some hydraulic fluid and that small amount would burn.  However, the remainder of the fuel would not be ignited.  Instead, the wicks would burn in a manner similar to a candle, although the flame would be a little larger than a typical candle because the wicks (made from strips of torn cloth) were larger than a conventional candle wick.  The burning cloth wick could potentially cause scorch marks on a surface on which it rested, just as the burning wick of a candle can cause scorch marks if it contacts a susceptible surface.  The burning wick might also potentially ignite a readily combustible material that it happened to contact, such as a drape or couch, in the same manner as candles have started many residential fires over the years.

2 - OPINION AND ORDER

**Discussion**

For conspiring to commit arson--or attempted arson--Angeleas and his co-conspirators face not less than five, nor more than twenty years, in federal prison.  Not satisfied with that penalty, the United States sought and obtained an indictment charging three additional counts carrying greater penalties.  It is those three additional counts that Angeleas challenges here.

**Count Three**

Count Three of the Superseding Indictment charges that Angeleas "knowingly possessed a destructive device, to wit: an incendiary device similar to a fire or incendiary bomb or molotov cocktail."  This count relies upon 18 U.S.C. §§ 924(c)(1)(A), 924(c)(1)(B)(ii), and § 921(a)(3).

Section 924(c)(1)(A) concerns possessing, brandishing, or discharging a firearm in the course of a crime of violence (or drugs).  Section 924(c)(1)(B) then provides:

> (B) If the firearm possessed by a person convicted of a violation of this subsection--
>
> **(i)** is a short-barreled rifle, short-barreled shotgun, the person shall be sentenced to a term of imprisonment of not less than 10 years; or
>
> **(ii)** is a machinegun or a destructive device, or is equipped with a firearm silencer or firearm muffler, the person shall be sentenced to a term of imprisonment of not less than 30 years.

A 30 year mandatory minimum sentence thus turns on whether the devices in question are a "destructive device" and therefore

3 - OPINION AND ORDER

a "firearm."  That a qualifying "destructive device" is deemed a "firearm" suggests Congress had in mind something more than a large candle.  The statutory definitions confirm this inference.  The terms "firearm" and "destructive device" are defined in 18 U.S.C. § 921(a)(3) and (4):

> **(3)**  The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device.  Such term does not include an antique firearm.
>
> **(4)** The term "destructive device" means--
>
> **(A)** any explosive, incendiary, or poison gas--
>   **(i)** bomb,
>
>   **(ii)** grenade,
>
>   **(iii)** rocket having a propellant charge of more than four ounces,
>
>   **(iv)** missile having an explosive or incendiary charge of more than one-quarter ounce,
>
>   **(v)** mine, or
>
>   **(vi)** device similar to any of the devices described in the preceding clauses;
>
> **(B)** any type of weapon (other than a shotgun or a shotgun shell which the Attorney General finds is generally recognized as particularly suitable for sporting purposes) by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter; and

4 - OPINION AND ORDER

> **(C)** any combination of parts either designed or intended for use in converting any device into any destructive device described in subparagraph (A) or (B) and from which a destructive device may be readily assembled.
>
> The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 4684(2), 4685, or 4686 of title 10; or any other device which the Attorney General finds is not likely to be used as a weapon, is an antique, or is a rifle which the owner intends to use solely for sporting, recreational or cultural purposes.

I conclude that a jar of hydraulic oil is not what Congress meant by the terms "firearm" and "destructive device." It is not a bomb, grenade, rocket, missile, mine, or similar device. *Noscitur a sociis* ("it is known by its associates").

Hydraulic fluid can damage property, if only by soaking into it. A person could also inflict considerable damage using a machete, a pickup truck, or even a vase (as some husbands can attest), yet those are not considered "firearms" or "destructive devices" for purposes of 18 U.S.C. § 921(a)(3) and (a)(4).

Several published decisions are illustrative of what kinds of devices Congress intended this law to cover. For example, United States v. Oba, 448 F.2d 892 (9th Cir. 1972), held that a device consisting of seven sticks of dynamite wrapped in copper wire and equipped with a fuse and blasting caps, that was intended for use as a bomb, is a "destructive device" for

5 - OPINION AND ORDER

purposes of this section. In a case under a different section, but using a virtually identical definition, a large car bomb containing a mixture of fuel oil and fertilizer was deemed a "destructive device." United States v. Fine, 413 F. Supp. 728 (D. Wisc. 1976).

In United States v. Hedgcorth, 873 F.2d 1307 (9th Cir. 1989), the Ninth Circuit decided that a homemade napalm bomb is a "destructive device." It was essentially a military weapon. Military surplus manuals were used to design the bombs, the defendants operated a mercenary training school, and the napalm bombs were to be used to firebomb the cars and homes of former employees. By contrast, in United States v. Reed, 726 F.2d 570 (9th Cir. 1984), cans of gasoline, with a crude wick, were held not to be a "destructive device." See also United States v. Podolsky, 625 F. Supp. 188, 197-99 (N.D. Ill. 1985) (styrofoam cup containing gasoline, chlorine, and brake fluid was not what Congress meant by a "destructive device" for purposes of this statute).

In United States v. Hamrick, 43 F.3d 877, 879 (4th Cir. 1995) (en banc), a letter bomb made from butane lighters which "could have produced a 1000-degree fireball up to three feet in diameter . . . possibly resulting in death" qualified as a destructive device. United States v. Worstine, 808 F. Supp. 663 (N.D. Ind. 1992), found that a pipe bomb was a destructive device, but homemade firecrackers did not qualify.

At oral argument, the government asserted that the devices at issue here technically constitute an "incendiary bomb," albeit

6 - OPINION AND ORDER

"[o]ne of the worst incendiary bombs we've ever seen."

Generally speaking, a bomb is a weapon designed to explode.[1] Incendiary bombs, also known as fire bombs, are bombs designed to start fires. They commonly contain substances such as thermite (a mixture of aluminum powder and ferric oxide), white phosphorus, chlorine triflouride, magnesium, or napalm. Incendiary bombs can also include propane and "fuel air" bombs. Though the ingredients and design vary, the end result is the same. On detonation, a raging fire erupts. Some incendiary bombs burn at extremely high temperatures, incinerating or melting nearly everything in their path. Other incendiary bombs are designed to suffocate victims by consuming all available oxygen. These are terrifying weapons, especially when wielded against a civilian population. The devices at issue here are not incendiary bombs.

Some published decisions treat a "Molotov cocktail" as an incendiary bomb. See, *e.g.*, Podolsky, 625 F. Supp. at 197. Assuming that is legally correct--a question I do not decide today--the device here is not a Molotov cocktail, for the reasons stated below in the discussion of Count Two.

Having mandated a 30 year minimum sentence for possessing a "destructive device" while committing certain crimes, Congress doubtless was targeting a particularly insidious evil, in the same category as a bomb, grenade, missile, mine, or machine gun-- not a bottle of hydraulic fluid or burning rag. As a matter of

---

[1] Even a "poison gas bomb" often contains a small explosive "burster" charge which breaches the wall of the device, allowing the gas to escape.

7 - OPINION AND ORDER

law, the devices that Angeleas possessed are not a "firearm" or "destructive device" as defined in 18 U.S.C. § 921(a)(3) and (a)(4). Therefore, Count Three of the superseding indictment must be dismissed.

**Count Four**

Count Four charges that Angeleas "knowingly possessed a destructive device to wit: a molotov cocktail, which was not registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. § 5861(d)."

Section 5861(d) makes it unlawful for a person "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." The term "firearm," defined in 26 U.S.C. § 5845(a), includes "(8) a destructive device" which, in turn, is defined in 26 U.S.C. § 5845(f). That definition essentially is the same as in Count Three (18 U.S.C. § 921(a)(3) and (4)), and I reach the same result as in Count Three. As a matter of law, the devices that Angeleas possessed are not "destructive devices" as defined in 26 U.S.C. § 5845(f), nor are they "firearms" as defined in 26 U.S.C. § 5845(a). Count Four is dismissed.

**Count Two**

Count Two of the superseding indictment alleges that Angeleas "did unlawfully and knowingly carry an explosive, to wit: an incendiary device similar to a fire or incendiary bomb or molotov cocktail, during the commission of a felony . . . in violation of 18 U.S.C. § 844(h)(2)." 18 U.S.C. § 844 (h) provides, in relevant part, that:

8 - OPINION AND ORDER

> **(h)** Whoever--
> > * * * *
> > **(2)** carries an explosive during the commission of any felony which may be prosecuted in a court of the United States,
>
> including a felony which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device shall, in addition to the punishment provided for such felony, be sentenced to imprisonment for 10 years.

The word "explosive" is defined in 18 U.S.C. § 844(j):

> **(j)** For the purposes of subsections (d), (e), (f), (g), (h), and (i) of this section . . . the term "explosive" means gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuzes (other than electric circuit breakers), detonators, and other detonating agents, smokeless powders, other explosive or incendiary devices within the meaning of paragraph (5) of section 232 of this title, and any chemical compounds, mechanical mixture, or device that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture, or device or any part thereof may cause an explosion.

The government does not contend, and the indictment does not allege, that the devices at issue "may cause an explosion." Rather, the government argues the devices in question are "other explosive or incendiary devices within the meaning of paragraph (5) of section 232 of this title." 18 U.S.C. § 232(5) provides that for purposes of this chapter:

> (5) The term "explosive or incendiary device" means (A) dynamite and all other forms of high

>    explosives, (B) any explosive bomb, grenade,
>    missile, or similar device, and (C) any incendiary
>    bomb or grenade, fire bomb, or similar device,
>    including any device which (i) consists of or
>    includes a breakable container including a
>    flammable liquid or compound, and a wick composed
>    of any material which, when ignited, is capable of
>    igniting such flammable liquid or compound, and
>    (ii) can be carried or thrown by one individual
>    acting alone.

The government relies on subpart (C), but that subpart does not cover the devices in question here. Angeleas did not possess an "incendiary bomb or grenade, fire bomb, or similar device . . . ." The government contends Subpart (C) encompasses Molotov cocktails, but this won't rescue the government's case.

That Angeleas intended to construct such a device, or subjectively believed he had succeeded, is not enough to convict him of violating § 844(h)(2). The device must actually have been an incendiary bomb, fire bomb, or similar device.  It was not.

The shortcomings in the government's argument are evident when the devices in question are compared with the government's depiction of a Molotov cocktail:

>    In action, the fuse is lit and the bottle hurled
>    at a target.  When the bottle smashes on impact,
>    the lit fuse ignites a cloud of gasoline droplets
>    and vapor, causing a fireball followed by a fire
>    as the remainder of the fuel is consumed.

Government's Brief at 6.[2]

---

[2] The apparent source of that definition is Wikipedia, which presently reads:

>    In action the fuse is lit and the bottle hurled at
>    a target such as a vehicle or fortification.  When
>                                          (continued...)

10 - OPINION AND ORDER

The devices at issue here would not generate a cloud of fuel droplets and vapor, nor would the wick ignite a fireball.  There would be no raging fire as the remaining liquid was consumed.  Instead, there would be only a shattered vodka bottle, an oily puddle, and a burning wick.

The government argues the devices in question are "similar" to a Molotov cocktail, for purposes of subpart (C).  I disagree.  The glass bottles are breakable containers and the cloth strips were intended to serve as wicks, but the devices lacked "a flammable liquid or compound" that would be ignited by this wick.

For purposes of the statute, "flammable" means something more than simply "capable of burning."  Walnut shells are capable of burning, and are even used as fuel in some power plants, yet we would not ordinarily characterize a jar of walnuts as a Molotov cocktail.  Sugar is difficult to ignite but, once ignited, a sugar mill fire may burn for days.  Aluminum powder can burn fiercely on contact with water.  Yet sugar, water, and aluminum are principal constituents of a can of soda.  In short, nearly anything is "capable of burning" under the right conditions.

---

$^2$(...continued)
    the bottle smashes on impact, the ensuing cloud of
    petrol droplets and vapor is ignited, causing an
    immediate fireball followed by a raging fire as
    the remainder of the fuel is consumed.

http://en.wikipedia.org/wiki/Molotov_cocktail (checked July 19, 2008).

The definition in the  government's brief omits "immediate" and "raging."  The omitted words further underscore why the device here is not a Molotov cocktail.

11 - OPINION AND ORDER

Angeleas argues that "flammable" is a term widely used in science and industry. The "flash point" of a substance is the temperature at which the substance emits sufficient fumes to ignite when a source of ignition (such as a match or spark) is brought near it. "Highly flammable" substances have flash points well below room temperature. The flash point of gasoline is approximately minus forty degrees Fahrenheit. "Flammable" liquids ignite easily at normal working temperatures. Under that definition, acetone, alcohol, and Coleman fuel are examples of flammable liquids. A "combustible" liquid can burn, but will not catch fire as readily as a flammable liquid.

Under one commonly recognized set of standards, a flammable liquid has a flash point under one hundred degrees Fahrenheit, while a combustible liquid has a flash point between one and two hundred degrees Fahrenheit. Examples of combustible liquids include kerosene, aviation fuel, and diesel. By contrast, the flash point of the hydraulic oil used by Angeleas exceeds four hundred degrees Fahrenheit.

In United States v. Mena, 933 F.2d 19 (1st Cir. 1991), the court declined to apply a strictly scientific definition of "flammable," preferring "the word's common usage, i.e., 'capable of being easily ignited and of burning quickly . . . .'" Id. at 27. I need not decide today whether Congress intended for courts to use the scientific definition of "flammable," or the "common usage" definition employed by Mena.

The devices at issue here fail either test. The hydraulic oil was not capable of being easily ignited and of burning

12 - OPINION AND ORDER

quickly.  The burning wick could not ignite the puddle of fluid from the shattered glass container.

The reported decisions applying this statute involve either highly flammable liquids or jellies, such as gasoline or napalm, or only slightly-less volatile liquids such as kerosene, lantern fuel, or paint remover.  That the liquid would burn, and rapidly, was never in doubt.  Cf.  Reed, 726 F.2d 570 (9th Cir.) (gasoline cans ignited by wicks); United States v. Cutler, 676 F.2d 1245 (9th Cir. 1982) (gasoline) (though acquitted, since pouring gas around and igniting it isn't an incendiary device); United States v. Gere, 662 F.2d 1291 (9th Cir. 1981) (photocopier fluid was flammable, though spreading it around and then igniting it wasn't an "incendiary device"); United States v. Ragusa, 664 F.2d 696 (8th Cir. 1981) (gasoline in cans, with matchbooks employed as wicks); United States v. Birchfield, 486 F. Supp. 137 (M.D. Tenn. 1980) (gasoline) (though acquitted, since pouring gas around and igniting it isn't an incendiary device); Mena, 933 F.2d 19 (bomb containing kerosene-like substance); United States v. Stackpole, 811 F.2d 689 (1st Cir. 1987) (lantern fuel was the flammable liquid); United States v. Agrillo-Ladlad, 675 F.2d 905 (7th Cir. 1982) (naphtha); United States v. Tankersley, 492 F.2d 962 (7th Cir. 1974) (paint remover in a bottle, with M-80 firecracker affixed as a detonator).

There already exist statutes covering arson, attempted arson, and conspiracy to commit arson.  To warrant the additional charge and ten year consecutive sentence, there has to be something particularly egregious about the method of arson.

13 - OPINION AND ORDER

Devices such as Molotov cocktails pose a special danger. Such a device can be hurled into an occupied residence or crowded nightclub, or employed against the police, or thrown into a doorway to prevent escape, or be utilized in other volatile situations such as a riot. In an instant, the target is ablaze, making this an especially lethal device. Notably, Congress specified that a qualifying device must be capable of being carried or thrown by one person acting alone. 18 U.S.C. § 232(5). This further illustrates the particular threat Congress was targeting. Regardless of what Angeleas may have intended to construct, the devices here are not a Molotov cocktail or its equivalent.

    Mr. Angeleas is guilty of many things, including felony stupidity. Had he succeeded in setting fire to the nightclub, someone could have died, even though that was not his intent. Conspiracy to commit arson is punishable by five to twenty years in prison. Angeleas will have ample time to contemplate the seriousness of his actions.

    By pure fortuity, however, Angeleas did not "carry an explosive, to wit: an incendiary device similar to a fire or incendiary bomb or molotov cocktail, during the commission of a felony . . . in violation of 18 U.S.C. § 844(h)(2)." Therefore, Count Two of the Superseding Indictment must be dismissed.

/ / / /

/ / / /

/ / / /

/ / / /

14 - OPINION AND ORDER

## Conclusion

Counts Two, Three, and Four of the Superseding Indictment are dismissed.

IT IS SO ORDERED.

DATED this 21st day of July, 2008.

/s/ Owen M. Panner
_____

Owen M. Panner
United States District Judge

15 - OPINION AND ORDER